## Case No. 16,842.

### VANDERHOOF v. CITY BANK OF ST. PAUL.

[1 Dill. 476: [1] 5 N. B. R. 270; 3 Leg. Gaz. 268; 3 Chi. Leg. News, 338, 355.]

Circuit Court, D. Minnesota. June Term, 1871.

BANKRUPTCY—SUFFERING PROPERTY TO BE TAKEN ON LEGAL PROCESS.

1. The requisite intent on the part of an insolvent debtor to give, and of a creditor to secure, a preference which is illegal under the bankrupt act [of 1867 (14 Stat. 517)], may be inferred from circumstances.

[Cited in Warren v. Tenth Nat. Bank, Case No. 17,202.]

2. Where the creditor knew the debtor to be insolvent in the legal sense: that he had committed an act of bankruptcy; that he had no property but his stock in trade: that the debtor was unable to pay or meet his debt, though urged to do so, and when sued by such creditor for a large sum gave no notice of the suit to the other creditors, and did not defend it nor otherwise make any effort to prevent the judgment and the levy and sale of goods thereunder; and where ·the effect of sustaining the judgment and levy would be to allow that creditor to make his whole debt and leave the other creditors nothing: Held, that the levy of the execution did not under such circumstances give a valid lien on the goods as against the assignee in bankruptcy. Per Dillon. Circuit Judge. Nelson, District Judge, contra.

This is a bill in equity, filed in this court by the assignee in bankruptcy of the firm of Vanderhoof Bros., against the City Bank of St. Paul. The object of the suit is to determine which of the parties has the better right to the stock of goods of the bankrupts, or the proceeds thereof. The assignee claims these goods, or their value, as assets of the bankrupts. The bank, on the other hand, maintains that it secured a valid lien thereon by virtue of the judgment and execution hereinafter mentioned. The bill attacks the judgment and execution as being obtained in violation of the bankrupt act. The pleadings and proofs show the following state of facts: About the 20th day of July, 1869, Vanderhoof Bros. purchased of Mrs. Marvin a small retail boot and shoe store in the city of St. Paul, for the sum of $2,000, and gave their notes therefor; one for $1,000, due in six months from the said 20th day of July; one for $500, due in eight months, and the other for $500, due in one year. Vanderhoof Bros. commenced business with a capital not exceeding $600 or $800. Before the purchase of the stock was made the City Bank of St. Paul, through Mr. Upham, the cashier, at Vanderhoof's request, agreed to discount said note for $1,000, and afterwards did so, and it is one of the notes on which the bank subsequently recovered judgment as hereinafter stated. On the 22d day of January, 1870,

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

the bank commenced suit against Vanderhoof Bros. in the state court, on a note dated December 24, 1869, for $209, due January 15, 1870; on a note for $350, dated November 2, 1869, payable to the bank, and due January 1, 1870 (indorsed January 19, 1870, $100); a note for $600, dated November 20, 1869, payable to the bank, and due January 19, 1870; ·and, also, on the abovementioned note given to Mrs. Marvin for $1,000, which matured January 20, 1870. On the 26th day of February, 1870, judgment, by default, was taken on these notes in favor of the bank and against Vanderhoof Bros. for $2,130, and on the same day an execution was issued and placed into the hands of the sheriff, and immediately afterwards levied upon the whole stock in trade of the debtors, and the same was subsequently (March 25, 1870) sold, yielding the sum of $2,385.71, which is now in the hands of the clerk of the United States district court. The sale by the sheriff was first enjoined by the United States district court, but the judge thereof, on a showing that such a sale was expedient, allowed it to be made on condition that the proceeds should be deposited therein. On the 11th day of March, 1870 (after the levy and before the sale under the execution), a petition in bankruptcy was filed in the United States district court against Vanderhoof Bros., and they were (March 24) adjudicated bankrupts, and the complainant appointed the assignee. The stock in trade levied on and sold constituted all the property of the bankrupts. In addition to the above facts, D. W. Vanderhoof, as a witness for the plaintiff, testified that they transacted all their business with the City Bank, of which Mr. Upham was the cashier and active business man; that they kept their bank account there; that in December, 1869; Mr. Upham called upon them at their store for a statement of their business affairs and condition; he took it down on an envelope; it was taken from their books, and showed their debts and accounts falling due from October, 1869, to March, 1870; it showed their debts, excluding what they owed the bank, to be $3,500, and including the debt to the bank, $5,600, and that their assets at cost price exceeded their liabilities. The witness also stated that in October, 1869, an inventory was taken which showed $6,500 stock, and it had not decreased $1,000 when statement was made; that the assets remained about the same until the levy, and were then of the value of $5,500, but cost more than that. He says: "We did not pay the notes to the City Bank because we did not have the money. I told the officers of the bank so —that we did not have the money. They urged payment, and I told them we were doing the best we could to collect money and to sell goods to pay them. I told them this about every time a note became due, and when renewal notes were given, and in January, 1870, I told them we had plenty of goods to pay

all our debts if they would not crowd us." * * * "It was through my influence that Mr. Upham advanced the $1,000 to Mrs. Marvin, of whom we bought." * * * "I had no conversation with Mr. Upham about the suit. After it was brought he told me that on Mr. Reed coming into the bank he disliked the account, and had forced him (Upham) to do what he had done. I told Upham I had done the best I could about making payments." Mr. Johnson, a resident creditor, testified that after the levy he asked Vanderhoof "why he allowed the City Bank to take judgment without letting him know that suit had been commenced;" to which he replied. "because he felt under obligations to Mr. Upham." This statement, Mr. Vanderhoof, being called as a witness by the bank, denies. Mr. Mason, a creditor, testified that he asked Upham about the judgment, and said he knew exactly how the firm stood, how much they owed, and where and when it would become due, mentioning a large Chicago debt of $2,100, and that they could not pay it, and that Vanderhoof had promised him that if they got into trouble he would make their claim good, and that he had this understanding with him. Mr. Upham, as a witness for the bank, testified that he had some conversation with Mr. Mason about the affairs of Vanderhoof Bros., but denied that he had ever made the statement to which Mr. Mason testified, or any statement of the kind, or that he had ever had any such understanding with Vanderhoof. He stated that suit was brought because Mr. Reed had purchased a controlling interest in the bank, was the vice-president, and insisted that the claim should be collected. He testified that the statement made to him by Vanderhoof was such a one as the bank requires of all their customers, whose affairs they do not know all about. It showed, as near as he could remember, that the assets exceeded liabilities by about $1,500, and he says he considered them solvent, and so reported to Reed, the vice-president, who nevertheless insisted that the debt should be collected, and that this was the reason suit was brought, and that he so stated to Mr. Vanderhoof.

Rogers & Rogers and C. K. Davis, for the assignee.

Newell & Brill, for the bank.

Before DILLON, Circuit Judge, and NELSON, District Judge.

DILLON, Circuit Judge. There can be no reasonable doubt that in January, 1870, when the bank commenced suit, Vanderhoof Bros. were insolvent. They had no assets except their stock in trade. Not to mention other debts, they owed the bank over $2,100. They had no money with which to pay, and no means with which to raise money except their stock of merchandise, which at cost price did not more than equal the amount of their lia-

bilities, and which, when sold by the sheriff, did not bring more than about one-third of what they owed. Plainly, they were insolvent. They were urged to pay, and only failed to pay because they could not; and this was the reason they declared to the bank. Surely a mercantile firm, having no property but their stock in trade, who, when pressed for a debt admitted to be just, give as a reason that they are unable to pay it, and suffer judgment to be rendered against them, is insolvent within any accepted or sound definition of that term, as used in the bankrupt act, and this, although the stock in trade may, at cost price or cash value, could it be sold for what it is worth, equal or exceed the trader's liabilities. The notes held by the bank and on which its suit was brought were commercial paper, and one of them was, at the time suit was commenced, more than fourteen days past due, and was not paid simply because the bankrupts were unable to pay it. This was of itself an act of bankruptcy, and proof of insolvency. Shawhan v. Wherrett, 7 How. [48 U. S.] 644; Smith v. Buchanan [Case No. 13,016]. And of all these facts the bank had notice.

I lay out of consideration as not sustained by the evidence the allegation of the bill that the Messrs. Vanderhoof procured the judgment to be rendered; nor is it shown that there was any collusion between them and the officers of the bank with reference to the suit which the bank commenced. Undoubtedly the debtors would have preferred that suit should not have been brought; but payment being demanded which they were unable to make, and having no defence to the notes, and feeling friendly to the bank, and under obligations to it, they suffered judgment to go against them, knowing, of course, that they could not meet it, and that their stock was liable to be, and probably would be, as it was, seized to pay it. Now under these circumstances, has the bank a right to hold the preference which it has sought to gain by its judgment and execution? If so the bankrupt act, known to have been framed to supersede the system of preferences, and to place all unsecured creditors of an insolvent upon the same footing, is signally defective. If the debtors had turned out their goods to the bank in payment of these notes, clearly the bank could not, with its knowledge of their condition, have held them against the assignee. Section 35. The act dissolved all attachments made within four months of its taking effect; and it is planted full of provisions intended to secure equality, and to prevent preferences. The bankrupts did not, before judgment, give notice to their other creditors in the same city or elsewhere that the bank had sued them. The motive of the bank in bringing suit was to secure their debt, and a knowledge of the condition of the debtors prompted the suit. The bank knew facts which, in law, showed their debtors to be in-

solvent and that they had committed an act of bankruptcy in not paying one of the notes in suit when urged to do it.

As the debtors did not defend the action, nor give notice to other creditors that it had been brought, nor go into bankruptcy, and were insolvent, I have no difficulty in holding that they suffered judgment to go against them, and property to be seized on execution, with an intent to defeat the act.

Of these facts the bank was cognizant, and the requisite intent on the part of debtors to give, and on the part of the bank to obtain, an illegal preference may and should be inferred from the circumstances. These circumstances are the known insolvency (in the legal sense) of the debtors, the fact that they had committed an act of bankruptcy; that they had no property but their stock in trade; that being pressed to pay, they were unable to do so; that they gave no notice of the suit, and did not defend it, or go into bankruptcy, nor otherwise make any effort to prevent the judgment, levy, or sale; and that the effect of sustaining the execution proceedings would be to allow one unsecured creditor to make his whole debt, and leave the other creditors nothing. To sustain the right of the bank to the benefit of its judgment and levy, would subvert the bankrupt act, and if such a claim were maintainable, the bankrupt act would be speedily repealed, so as to allow all creditors to strive for preferences.

A decree should, in my opinion, be entered, establishing the right of the assignee to the money produced by the sale of the goods, and ordering the defendant to pay the costs of this suit.

The testimony shows that the property brought a good price, and I do not think we should charge the defendant with the difference between what the property sold for, and its supposed market value at the time it was seized.

It is proper to add that Judge NELSON is of opinion that the requisite intent to defeat the bankrupt act cannot be inferred from the circumstances above mentioned, and hence that the bank secured a valid lien on the stock by the judgment and levy.

NELSON, District Judge. I cannot assent to the conclusion of the circuit judge in this case. I agree that Vanderhoof Bros., being merchants, had committed an act of bankruptcy, in not resuming payment of their commercial paper within a period of fourteen days after suspension, and were thus legally insolvent at the time the suit was commenced against them by the bank. I also agree, that when urged by the bank to pay, they told the cashier "that they had no money to pay their debts with, but their property was ample to meet all their liabilities."

The bank, with knowledge of this condition of the debtors' affairs, commenced suit upon several notes held by them against the debtors, obtained a judgment by default, and the sheriff made a levy by virtue of an execution issued before the bankruptcy proceedings were instituted. The question is now presented: Did the debtors, by remaining passive while all these proceedings were progressing, from the time of the service of the summons down to the final levy under the execution, suffer their property to be seized by legal process, with intent to give preference to the bank, or with intent to delay and defeat the bankrupt act, and did the bank have reasonable cause to believe that a fraud on the act was intended?

The intent to prefer is a necessary ingredient of the charge made in the bill of complaint, and must be proved. There is no direct evidence to establish any consent by the debtors to the commencement of a suit against them, nor of collusion between them and the bank. They said nothing in their interview with the cashier at the time when informed by him, that the directors had determined to enforce the collections of the notes by a suit which would show any intention to give a preference.

"Johnson," a creditor of the debtors, swears that one of them told him that he did not inform any of his other creditors of the proceedings instituted by the bank, because "he felt under obligations to the cashier." This testimony is met by the debtor with an emphatic denial that he ever made any such statement; so that I am satisfied that the debtor said nothing which could fix any illegal intent upon him. The complainants' counsel invokes the familiar principle that every person is presumed to intend the natural consequences of his acts, and contends that the result of all the proceedings instituted by the bank, and the conduct of the debtors enabled the former to obtain a preference, and therefore we must presume that the latter intended it.

I cannot give my assent to the application of this rule to the facts as they exist in the case. The debtors had no defence to the notes sued upon; the liability was incurred for a valuable consideration. The cashier knew all of the circumstances under which a large portion of the indebtedness had been created, and the judgment was obtained, not only without any act on the part of the debtors, but in spite of them. Any defence that the debtors might interpose would have been sham, and merely delayed the final judgment. The law of this state would not justify any such conduct on the part of the debtors, and no honest debtor would seek to delay a recovery of a just debt by interposing a sham defence. Upon this state of the case how can the judgment obtained by due course of law, establish an intent to prefer the judgment creditor?

It is said by counsel that the debtors should have defeated the action of the bank by voluntarily filing their petition in bankruptcy. I can find nothing in the law compelling an insolvent debtor to thus put himself into

bankruptcy. Various reasons satisfactory to himself and in accordance with good faith, may influence him and prevent him from doing this. He may not wish to acknowledge, by so doing, that he is hopelessly ruined in his business; or he may think that he will still be enabled, with his property on hand, to arrange with his creditors by obtaining additional time within which to pay his indebtedness. Entertaining these views, I cannot believe that in this case, when the debtors have sworn that they did not intend to give a preference, such intent can be fairly inferred because they did not seek the bankrupt court.

If the judgment obtained under these circumstances does not substantiate the charge of an intent to prefer, did the further proceedings taken by the sheriff. to wit: a levy by virtue of an execution. establish the charge that the debtors suffered their property to be seized by legal process with intent to give a preference? The laws of this state provide that a judgment is a lien on real estate as soon as docketed, and points out the steps necessary to be taken to make it a lien on personal property. The law directed the sheriff in the discharge of his duties, and the lien became perfect upon the property in controversy here, without any participation of the debtors in the matter. The lien having been thus obtained. before bankruptcy proceedings were instituted, in my opinion, is protected by the act. If it is not to be recognized as valid, but is to be regarded as obtained in violation of the act, and a fraud upon it, congress must say so, or the supreme court so decide.

The Circuit Judge being of the opinion that the assignee should recover, a certificate of division was ordered, on questions stated: [1. Whether or not an intent on the part of said debtors, Vanderhoof Brothers, to suffer their property to be taken on legal process, to wit: the said execution, with intent to give a preference to said bank, or with intent thereby to defeat or delay the operation of the bankrupt act, can be inferred from the foregoing facts. 2. Whether, under the said facts, the said bank, in obtaining said judgment, and making the said levy, had reasonable cause to believe that a fraud on the bankrupt act was intended? 3. Whether, under said facts, the bank obtained, by. the levy of its execution, a valid lien on the said goods as against the assignee in bankruptcy?] [2]

[The case was accordingly taken to the supreme court upon a certificate of division in opinion. The first two questions under discussion were decided in the negative, the third in the affirmative. 17 Wall. (84 U. S.) 473.]

As to proof of fraudulent preference, see Giddings v. Dodd [Case No. 5,405]; Linkman v. Wilcox [Id. 8,374]; Rison v. Knapp [Id. 11,861]; Martin v. Toof [Id. 9,167]; Wright v. Filley [Id. 18,077].

[2] [From 5 N. B. R. 270.]